670 F.2d 826
 Fed. Sec. L. Rep. P 98,604
Genevieve SHIVERS; Donald Shivers; Ralph and Mary Shivers;
Linda S. Shivers; Stephen Shivers, by Ralph C. Shivers, his
guardian ad litem; Kenneth and Harriet Shivers; Michael J.
Shivers; Robert J. Shivers; Patrick E. Shivers; Theresa A.
Shivers, by Kenneth Shivers, her guardian ad litem; Margaret
A. Shivers, by Kenneth Shivers, her guardian ad litem; James
C. Shivers, by Kenneth Shivers, his guardian ad litem;
William and Shirley Stewart, jointly and individually;
Laurie A. Stewart; Sherry M. Stewart, by William Stewart,
her guardian ad litem; Gail L. Stewart, by William Stewart,
her guardian ad litem; Karen L. Stewart, by William Stewart,
her guardian ad litem; Patricia K. Stewart, by William
Stewart, her guardian ad litem; and Carl E. Klingner,
Plaintiffs-Appellants,
v.
AMERCO, a Nevada corporation; Leonard S. Shoen; Daniel R.
Mullen; Samuel W. Shoen; Michael L. Shoen; Edward
J. Shoen; and Mark V. Shoen, Defendants-Appellees.
 Nos. 79-3065, 80-5477.
 United States Court of Appeals,
Ninth Circuit.
 Argued and Submitted Dec. 9, 1980.
Decided March 1, 1982.
 
 Gary L. Grenley, Stoll & Stoll, Portland, Or., for plaintiffs-appellants.
 Gary L. Birnbaum, Mariscal, Weeks, McIntyre & Friedlander, P. A., Phoenix, Ariz., argued, for defendants-appellees; Jock Patton, Streich, Lang, Weeks & Cardon, Phoenix, Ariz., on the brief.
 Appeal from the United States District Court for the District of Arizona.
 Before FLETCHER and POOLE, Circuit Judges, and HENDERSON,* district judge.
 FLETCHER, Circuit Judge:
 
 
 1
 These are consolidated appeals from the district court's judgment dismissing plaintiffs' claims under Rule 10b-5 and various state blue sky laws, and granting summary judgment for defendants on plaintiffs' claim of breach of fiduciary duties. We conclude that the claims under Rule 10b-5 and the blue sky laws were properly dismissed, but that summary judgment on the claim of breach of fiduciary duties was improper.
 
 
 2
 * FACTS
 
 A. Plaintiffs' Allegations
 
 3
 Plaintiffs' complaint and amended complaint allege the following. In May of 1975, plaintiffs were minority shareholders of Amerco, the parent company for the U-Haul businesses conducted across the nation. Amerco stock was freely traded among minority shareholders, most of whom were U-Haul employees. The normal trading price was approximately 120% to 130% of book value. Amerco had an informal policy of repurchasing stock at book value whenever a shareholder requested it.
 
 
 4
 The individual defendants in this action, mostly members of the Shoen family, were officers and directors of Amerco and together controlled approximately 94% of Amerco's stock. Some time prior to May 10, 1975, defendants decided to destroy the informal market for Amerco stock so that Amerco could acquire minority shareholders' stock at a low price. To this end, defendants called a special shareholders' meeting on May 10, 1975. The individual defendants voted their stock at the meeting so as to cause defendant Amerco to declare a 100-for-1 reverse stock split.
 
 
 5
 Soon after the meeting, Amerco changed its repurchase policy and announced that in the future it would buy back minority shareholders' stock at only 50% of book value. Amerco also refused to permit plaintiffs to advertise stock sales in Amerco's in-house newsletter, Amerco World. Some of the plaintiffs subsequently sold their stock back to Amerco for substantially less than book value.
 
 B. Procedural Posture
 
 6
 Plaintiffs filed suit, alleging violations of section 10(b) of the Securities Exchange Act of 1934 and Rule 10b-5, 15 U.S.C. § 78j(b) (1976); 17 C.F.R. § 240.10b-5 (1980), violations of various state blue sky laws, and breach of fiduciary duties.[1] The district court dismissed under Fed.R.Civ.P. 12(b) (6) the claims made under federal securities and state blue sky laws, and granted summary judgment for defendants on the claim of breach of fiduciary duties. Plaintiffs appeal.
 
 II
 FEDERAL SECURITIES VIOLATIONS
 
 7
 Section 10(b) of the Securities Exchange Act makes it unlawful "(t)o use or employ, in connection with the purchase or sale of any security ..., any manipulative or deceptive device or contrivance" in contravention of SEC rules. Rule 10b-5, promulgated by the SEC under section 10(b), requires the disclosure of material information, prohibits material misrepresentations, and prohibits the use of any device to defraud or any acts which operate as a fraud. A cause of action will lie under Rule 10b-5 "only if the conduct alleged can be fairly viewed as 'manipulative or deceptive' within the meaning of (section 10(b) )." Santa Fe Industries, Inc. v. Green, 430 U.S. 462, 473-74, 97 S.Ct. 1292, 1300-01, 51 L.Ed.2d 480 (1977).
 
 
 8
 Plaintiffs contend that the district court erred in dismissing their Rule 10b-5 claim for failure to state a claim, Fed.R.Civ.P. 12(b)(6). They argue that defendants have violated Rule 10b-5 by failing to disclose material facts in connection with plaintiffs' sale of Amerco stock, and by employing manipulative devices in connection with plaintiffs' sale of stock.
 
 
 9
 In reviewing a dismissal under Fed.R.Civ.P. 12(b)(6) we must take the allegations of the complaint as true. On the claim of failure to disclose, the plaintiffs allege that defendants did not reveal certain material facts at the May 10 shareholders' meeting: first, that defendants' actions were part of a plan to destroy the market in Amerco stock; second, that defendants' intent was to acquire the stock at a price below its true and fair value; and third, that defendants' actions would in fact destroy the market and decrease the value of Amerco stock.
 
 
 10
 On the claim of manipulation, plaintiffs allege that the reverse stock split and the change in repurchase policy prevented "free and honest balancing of investment supply with investment demand" and therefore constituted manipulation of stock prices. Plaintiffs rely on general statements in several cases to the effect that Rule 10b-5 prohibits "a broad range of manipulative practices." United States v. Charnay, 537 F.2d 341, 349 (9th Cir.), cert. denied, 429 U.S. 1000, 97 S.Ct. 527, 50 L.Ed.2d 610 (1976); see Herpich v. Wallace, 430 F.2d 792, 802 (5th Cir. 1970); Mutual Shares Corp. v. Genesco, Inc., 384 F.2d 540 (2d Cir. 1967).
 
 
 11
 We doubt that defendants' conduct would constitute failure to disclose or manipulation within the meaning of Rule 10b-5. The nature of the reverse stock split and the basic facts surrounding it were fully disclosed at the May 10 meeting. See Vaughn v. Teledyne, Inc., 628 F.2d 1214, 1221 (9th Cir. 1980); Alabama Farm Bureau Mutual Casualty Co. v. American Fidelity Life Insurance Co., 606 F.2d 602, 610-11 (5th Cir. 1979); Selk v. St. Paul Ammonia Products, Inc., 597 F.2d 635, 639 (8th Cir. 1979); Golub v. PPD Corp., 576 F.2d 759, 765 (8th Cir. 1978), Cf. United States v. Margala, 662 F.2d 622 (9th Cir. 1981) (In connection with a reverse stock split, the court found ample evidence to support a jury finding that the defendant had knowingly misstated and withheld information including providing false addresses to evade a California Corporations Commission investigation.). With respect to Rule 10b-5's prohibition of manipulative devices, plaintiffs can state a claim for manipulation only by alleging that defendants artifically affected market activity in order to mislead investors. Santa Fe Industries, Inc. v. Green, 430 U.S. 462, 476-77, 97 S.Ct. 1292, 1302-03, 51 L.Ed.2d 480 (1977); see Vaughn, 628 F.2d at 1220. Plaintiffs have not alleged that defendants misled investors by artificially depressing the price of Amerco stock. We need not reach these issues, however, because we find that the alleged violations were not sufficiently related to plaintiffs' sale of stock to give plaintiffs standing to sue.
 
 
 12
 Under Rule 10b-5, only a purchaser or seller of securities may bring a suit for damages. Blue Chip Stamps v. Manor Drug Stores, 421 U.S. 723, 95 S.Ct. 1917, 44 L.Ed.2d 539 (1975); Birnbaum v. Newport Steel Corp., 193 F.2d 461 (2d Cir.) cert. denied, 343 U.S. 956, 72 S.Ct. 1051, 96 L.Ed. 1356 (1952). The purchaser-seller rule excludes both "shareholders ... who allege that they decided not to sell their shares because of ... a failure to disclose unfavorable material (and) ... shareholders ... who suffered loss in the value of their investment due to corporate or insider activities ... which violate Rule 10b-5." Blue Chip, 421 U.S. at 737-38, 95 S.Ct. at 1926. These plaintiffs are in the category of "shareholders who suffered loss in the value of their investment."
 
 
 13
 It is true that several of the plaintiffs sold their stock before bringing this suit. By that time, however, plaintiffs were well aware of defendants' plan and the consequences of defendants' actions. Indeed, the basis of plaintiffs' grievance is that by the time they sold their stock, the informal market had been destroyed and stock prices had fallen. Plaintiffs were clearly not misled at the time the sales took place. The sales were not, therefore, "in connection with" the allegedly deceptive or manipulative practices. Plaintiffs cannot bring themselves within the statutory requirement by selling their stock at a time when they were fully aware of the facts and after any deception had ceased. See Ohashi v. Verit Industries, 536 F.2d 849, 852-53 (9th Cir. 1976); O'Brien v. Continental Illinois National Bank & Trust Co., 593 F.2d 54, 58 (7th Cir. 1979).
 
 
 14
 Plaintiffs argue that their claim is nevertheless permissible under the "forced-seller" doctrine set forth in Vine v. Beneficial Finance Co., 374 F.2d 627 (2d Cir.), cert. denied, 389 U.S. 970, 88 S.Ct. 463, 19 L.Ed.2d 460 (1967), and recognized by this court in Mount Clemens Industries, Inc. v. Bell, 464 F.2d 339 (9th Cir. 1972). In Vine, the defendants had acquired stock by means of a deception and then used the stock to institute a short-form merger. The plaintiff was a shareholder in the merged corporation, and was forced to exchange his stock for cash. The court held that because the short-form merger forced the plaintiff as a matter of law to sell, and because the deception and the merger were "all part of a single fraudulent scheme" which deceived an entire class of public stockholders the deception was " 'in connection with' the forced sale" for the purposes of liability under Rule 10b-5. 374 F.2d at 635.
 
 
 15
 In contrast to the plaintiff in Vine, plaintiffs here were not forced to sell their stock. They could have held the stock in hopes that it would increase in value. In fact, some of the plaintiffs still own their Amerco stock. Plaintiffs thus do not fall within the "forced-seller" doctrine established in Vine.
 
 
 16
 Plaintiffs argue that even though they were not legally forced to sell their stock, the reverse stock split and change in repurchase policy made it impossible as a practical matter for them to sell the stock to anyone other than Amerco. They rely on Travis v. Anthes Imperial Limited, 473 F.2d 515 (8th Cir. 1973), which appears to expand the "forced-seller" doctrine to apply in certain instances to plaintiffs who are not legally compelled to sell.
 
 
 17
 This circuit has not made such an expansion of the doctrine, and the application of the "forced-seller" doctrine in Travis was dictum in any event. There the court found that the plaintiffs had sold their stock to the defendants and that the fraud was in connection with the sale within the meaning of section 10(b) and Rule 10b-5, but stated that the "forced-seller" doctrine, as an alternate ground, would also accord standing to the plaintiffs. 473 F.2d at 522. Also, the facts in Travis were quite different. The plaintiffs were shareholders in a publicly-traded corporation that was being merged into the defendant corporation. The defendant had acquired over ninety percent of the stock of the merged corporation through a tender offer made only to Canadian shareholders and excluding U.S. shareholders. The remaining ten percent of the stock was held almost entirely by the Travis family. Plaintiffs alleged that the defendants induced plaintiffs by false representations to hold their stock until after the completion of the Canadian tender offer, thereby depriving them of the opportunity to sell their shares to Canadian shareholders at an advantageous price before the close of the tender offer. After the completion of the buyout of the Canadian shareholders, the defendants made a take-it or leave-it offer to the plaintiffs that they felt obliged to accept. Under the circumstances, the court was able to conclude that "the only possibility for sale of plaintiffs' stock was to (defendant) on (defendant's) terms." 473 F.2d at 523.
 
 
 18
 Nor does this court's recent holding in United States v. Margala, supra, compel a different result. In that case, the corporation eliminated fractional shares after a 10 to 1 reverse stock split, and later engineered a merger by which the minority shareholders were forced to exchange their stock for stock in another corporation, thus satisfying the § 10(b) requirement that the nondisclosure or manipulation be "in connection with the purchase or sale of any security."
 
 
 19
 Here, Amerco has not attempted to buy up the minority stock or in any way to force its sale. Plaintiffs remain free to trade with other minority shareholders on whatever terms they wish. The reverse stock split and change in repurchase policy may have decreased the value of the stock and made minority shareholders reluctant to trade, but we cannot conclude that plaintiffs have been "forced" to sell solely to Amerco. We conclude plaintiffs are not sellers or purchasers within the meaning of Rule 10b-5.
 
 III
 STATE BLUE SKY VIOLATIONS
 
 20
 Plaintiffs next argue that their complaint stated claims under the blue sky laws of Arizona, Ariz.Rev.Stat.Ann. §§ 44-1991, -2002 (1967); Nevada, Nev.Rev.Stat. §§ 90.110, .200 (1979); New York, N.Y.Gen.Bus.Law §§ 339, 352-c (McKinney 1968); Oregon, Or.Rev.Stat. §§ 59.115, .135 (1979); and Washington, Wash.Rev.Code § 21.20.010 (1974).
 
 
 21
 The blue sky laws of Arizona, Nevada, Oregon and Washington, parallel Rule 10b-5. Plaintiffs claim that the state laws should nevertheless be interpreted more broadly than Rule 10b-5 because the state laws, unlike the federal rule, are not restricted by the language of section 10(b) of the Securities Exchange Act of 1934. See Santa Fe Industries, Inc. v. Green, 430 U.S. 462, 472-74, 97 S.Ct. 1292, 1300-01, 51 L.Ed.2d 480 (1977) (limiting scope of Rule 10b-5 in accordance with language of section 10(b)). Since the state laws refer to fraudulent conduct generally, plaintiffs argue that they have stated a claim even if they have not alleged manipulative or deceptive acts as defined by Santa Fe.
 
 
 22
 Plaintiffs cite no case law in support of their argument that these four states interpret their blue sky laws differently from Rule 10b-5. The state of Washington provides by statute that its blue sky law is to be interpreted so as to "coordinate ... with the related federal regulations." Wash.Rev.Code § 21.20.900 (1974). The courts of Arizona, Oregon and Washington have interpreted their blue sky laws to be consistent with Rule 10b-5 in other respects. See, e.g., Greenfield v. Cheek, 122 Ariz. 70, 593 P.2d 293 (App.1978), approved, 122 Ariz. 57, 593 P.2d 280 (1979); Karsun v. Kelley, 258 Or. 155, 482 P.2d 533 (1971); State v. Hynds, 84 Wash.2d 657, 529 P.2d 829 (1974). Since Arizona, Nevada, Oregon and Washington chose to enact laws paralleling Rule 10b-5, we think it only logical that these states intended the statutes to be interpreted consistently with the federal rule. We therefore hold that plaintiffs have failed to state a claim under these states' blue sky laws, for the reasons discussed above in connection with plaintiffs' Rule 10b-5 claim.
 
 
 23
 New York's blue sky law does not parallel Rule 10b-5. N.Y.Gen.Bus.Law § 352-c[2] prohibits fraud or misrepresentation intended to induce the sale of securities, regardless of whether or not the sale actually took place. In addition, the statute is worded broadly enough to cover a wide variety of deceitful or manipulative practices.
 
 
 24
 The New York courts have read limits into section 352-c, however:
 
 
 25
 In order to state a cause of action for violation of section 352-c, a private plaintiff must allege the following elements: deception, materiality, reliance and proximate damage. As an essential element, a plaintiff must prove material misrepresentations, omissions of material facts, or some form of fraudulent or deceptive conduct.
 
 
 26
 Halle & Stieglitz v. Kolen, Blue Sky L.Rep. (CCH) P 71,435, at 68,435-36 (N.Y.Sup.Ct.1978) (citations omitted), aff'd, 71 A.D.2d 554, 418 N.Y.S.2d 552 (1979). The court in Halle & Stieglitz held that even though the defendants' actions had reduced the market price of the stock, the complaint failed to state a claim because it did not allege " 'fraud or deception designed to induce or promote the sale of the stock.' " Id. at 68,436 (citing Bosee v. Babcock International, Inc., 65 A.D.2d 727, 410 N.Y.S.2d 1008 (1978)). We likewise conclude that plaintiffs in this case have failed to state a claim under section 352-c. With respect to plaintiffs' nondisclosure claim, plaintiffs have not alleged reliance and proximate damage. As discussed above, they were no longer deceived at the time they sold their stock. They have not alleged that they relied to their detriment on any false or misleading statements. With respect to the manipulation claim, we conclude for the reasons given above that plaintiffs have not met the "fraud or deception" requirement enunciated in Halle & Stieglitz.
 
 
 27
 The district court was correct in concluding that plaintiffs failed to state a claim under federal or state securities laws. Plaintiffs' remedy, if any, must come from their claim that defendants breached their fiduciary duties.
 
 IV
 BREACH OF FIDUCIARY DUTIES
 
 28
 As a general rule, corporate decisions which reflect the management's "business judgment" will not be disturbed by the courts in the absence of fraud or bad faith. See, e.g., Klaus v. Hi-Shear Corp., 528 F.2d 225, 233 (9th Cir. 1975). In certain limited situations, however, management actions which injure minority shareholders will be held to violate management's fiduciary duties unless a "compelling business reason" for the actions can be shown. See id.; Jones v. H. F. Ahmanson & Co., 1 Cal.3d 93, 460 P.2d 464, 81 Cal.Rptr. 592 (1969).[3] The district court held, and both parties agree, that:
 
 
 29
 (i)n order to invoke the "compelling business reason" test ..., one of two circumstances must be present: either the directors or majority stockholders were engaged in self-dealing, or the actions taken by the directors or majority stockholders had a disproportionate impact on the minority stockholders.
 
 
 30
 Plaintiffs do not contend that defendants were engaged in self-dealing. Instead, they claim that the "compelling business reason" test should be applied because defendants' actions had a disproportionate impact on Amerco's minority shareholders. Since the district court granted summary judgment for defendants, we may affirm only if the material facts are undisputed and the defendants are entitled to prevail as a matter of law.A. Impact on Minority Shareholders
 
 
 31
 Plaintiffs argue that defendants' actions, which destroyed the informal market in Amerco stock, had a disproportionate impact on minority shareholders in two ways. First, plaintiffs assert that the minority shareholders wished to maintain a market in Amerco stock while the majority shareholders had no interest in maintaining a market. In plaintiffs' view, any action hurting the market in Amerco stock would thus have had a disproportionate impact on minority shareholders.
 
 
 32
 We find this argument unconvincing. In effect, plaintiffs are saying that defendants' actions had a disproportionate impact because the majority was happy with the results achieved while the minority was unhappy. The same could be said any time a corporate decision was opposed by minority shareholders. If the reverse stock split and change in repurchase policy destroyed the market for the majority's as well as the minority's stock, we must conclude that the changes affected the majority and minority equally. It is immaterial that the minority shareholders want to sell their stock while the majority shareholders do not.
 
 
 33
 Plaintiffs' second argument is much more convincing. Plaintiffs contend that defendants' actions destroyed only the market for the minority's stock, while the majority shareholders remain able to market their stock at or above book value. In support of this contention, plaintiffs have submitted the affidavit of a securities expert. The affidavit states that defendants' actions would dry up the informal market in which minority shareholders traded, but that "(t)he drying up of this informal market would have little effect on the ability of a majority shareholder to sell his stock" because "a majority stockholder's interest would only be sold to an extremely sophisticated investor" who would not be influenced by the high per-share price or the lack of a repurchase policy on the part of the company.
 
 
 34
 For purposes of this appeal, defendants do not dispute that their actions destroyed the informal market in Amerco stock. They argue only that the minority could not have been disproportionately affected because the reverse stock split, the change in the repurchase policy, and the denial of advertising space in Amerco World all applied to majority shareholders as well as to the minority.
 
 
 35
 With respect to plaintiffs' contention that the majority stock remains marketable despite destruction of the informal market, defendants assert that the affidavit of plaintiffs' expert is "based entirely on speculation" because no offer to buy a large block of stock has ever been received. We cannot agree. Since none of the individual defendants has ever expressed a desire to sell his stock, it is hardly surprising that no offers have been received. We conclude that the affidavit raises a question of fact as to what would happen if one of the defendants should decide to sell.
 
 
 36
 Defendants' final argument is that even if majority stockholders are able to market large blocks of shares, their ability to sell small amounts of shares (or fractions of shares) has been damaged just as the minority's ability to sell has been damaged. It is true that a majority shareholder might now find it difficult or impossible to market a fraction of a share. The fact remains, however, that a majority shareholder who wishes to liquidate his holdings may be able to find a market in which to sell, while a minority shareholder in the same situation may only be able to sell to Amerco for 50% of book value. If defendants' actions destroyed the market for the minority but not for the majority, we must conclude that defendants' actions had a disproportionate impact on the minority. Summary judgment for defendants would therefore be proper only if defendants could show a "compelling business reason" for the reverse stock split, the change in the repurchase policy, and the refusal to permit advertising in Amerco World.
 
 B. The "Compelling Business Reason" Test
 
 37
 Under the "compelling business reason" test, the majority shareholders can justify their actions only by showing "such good faith or compelling business purpose that would render their action fair under the circumstances." Jones v. H. F. Ahmanson & Co., 1 Cal.3d 93, 460 P.2d 464, 476, 81 Cal.Rptr. 592 (1969), quoted in Klaus v. Hi-Shear, 528 F.2d 225, 233-34 (9th Cir. 1975). To apply this test, the reviewing court "balanc(es) ... the good to the corporation against the disproportionate advantage to the majority shareholders and incumbent management." Hi-Shear, 528 F.2d at 234.
 
 
 38
 Defendants present the following justifications for their actions: (1) the ban on stock advertisements in Amerco World was necessary to avoid violating federal securities laws; (2) the decision not to repurchase stock at book value was necessary to avoid draining the corporation of capital needed for a new moving-center program; and (3) the reverse stock split, the advertising ban, and the change in the repurchase policy were all necessary to prevent further purchases by "unsophisticated investors" who might be relying on false or misleading information. Whether these justifications exist in fact and constitute a "compelling business reason" is an issue for the trier of fact. Facts and inferences that the parties would draw from them bearing on this issue are in dispute and are simply not amenable to resolution on a motion for summary judgment.
 
 
 39
 Defendants assert that some of Amerco's clerical and technical employees had bought Amerco stock on the basis of misinformation and that
 
 
 40
 (a)s these investors learned that their purchases had been made on the basis of false information regarding the company's policies and prospects, disenchantment grew, complaints were frequent, the directors' limited time was diverted from management concerns to answering inquiries and complaints from disgruntled shareholders, and rumors spread that the company was guilty of misrepresenting both its business prospects and the value of its stock as an investment vehicle.
 
 
 41
 Defendants characterize the reverse stock split and the other changes as "remedial actions" which were expected to "improve morale among Amerco's stockholder/employees, lessen the threat of litigation arising from the dissemination of false information and the resultant creation of false expectation, and encourage investors to analyze and understand Amerco's business before investing in its stock."
 
 
 42
 The plaintiffs challenge defendants' explanation. While defendants may have effectively prevented any new "unsophisticated investors" from buying in, they made no effort to buy out those who were already shareholders. They challenge defendants' claim that their actions were "remedial," since the "disgruntled shareholders" about whom defendants claim to be worried continued to hold their stock. If defendants were concerned about Amerco's employees purchasing stock on the basis of false information, they could have dealt with the problem by disseminating correct information rather than by destroying the market.
 
 
 43
 Moreover, plaintiffs contend defendants have not even attempted to provide any justification for causing Amerco to declare the reverse stock split at the same time that Amerco changed its repurchase policy. The change in repurchase policy alone might have been sufficient to eliminate the least sophisticated purchasers, making the reverse stock split unnecessary. Alternatively, Amerco could have declared the reverse stock split but continued its repurchase policy for a few months in order to allow dissatisfied minority shareholders to sell out. Either alternative would have done much less damage to the minority shareholders. See Klaus v. Hi-Shear, 528 F.2d at 233-34 (establishment of trust was advantageous to the corporation, but defendant had not shown compelling reason for establishing it at that time rather than at a time when it would have been less injurious to minority).
 
 
 44
 A trier of fact could conclude that the corporate advantage gained by defendants' actions was outweighed by the disproportionate impact on the minority shareholders. Because plaintiffs have raised questions of fact with respect to whether the "compelling business reason" test should apply and whether defendants had a compelling business reason for their actions, we hold that summary judgment for defendants was improper.
 
 
 45
 The judgment in No. 79-3065, dismissing plaintiffs' claims based on federal and state securities violations, is AFFIRMED. The judgment in No. 80-5477, granting summary judgment for defendants on plaintiffs' breach of fiduciary duties claim, is REVERSED and the case is REMANDED for further proceedings consistent with this opinion.
 
 
 
 *
 The Honorable Thelton E. Henderson, United States District Judge for the Northern District of California, sitting by designation
 
 
 [1]
 The original complaint, filed in the District of Oregon, alleged violations of the blue sky laws of Arizona, Nevada, New York and Oregon. The amended complaint, filed after the case was transferred to the District of Arizona, added a claim under the blue sky laws of Washington. Several other claims were alleged in both complaints, but have been abandoned on appeal
 
 
 [2]
 N.Y.Gen.Bus.Law § 352-c provides that:
 
 
 [1]
 It shall be illegal and prohibited for any person, partnership, corporation, company, trust or association, or any agent or employee thereof, to use or employ any of the following acts or practices:
 (a) Any fraud, deception, concealment, suppression, false pretense or fictitious or pretended purchase or sale;
 (b) Any promise or representation as to the future which is beyond reasonable expectation or unwarranted by existing circumstances;
 (c) Any representation or statement which is false, where the person who made such representation or statement; (i) knew the truth; or (ii) with reasonable effort could have known the truth; or (iii) made no reasonable effort to ascertain the truth; or (iv) did not have knowledge concerning the representation or statement made;
 where engaged in to induce or promote the issuance, distribution, exchange, sale, negotiation or purchase within or from this state of any securities or commodities, as defined in section three hundred fifty-two of this article, regardless of whether issuance, distribution, exchange, sale, negotiation or purchase resulted.
 
 
 [2]
 It shall be illegal and prohibited for any person, partnership, corporation, company, trust or association, or any agent or employee thereof, to engage in any artifice, agreement, device or scheme to obtain money, profit or property by any of the means prohibited by this section
 
 
 [3]
 Amerco is a Nevada corporation, and is governed by Nevada law. Although the Nevada courts have never considered the extent of majority shareholders' fiduciary duties, the district court assumed that Ahmanson and Hi-Shear, decided under California law, would apply in Nevada as well. The parties do not challenge this assumption, and we accept it for purposes of this case